# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | | |
|---|---|---|
| COYLE NISSAN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00075-TWP-TAB |
| | ) | |
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

This matter is before the Court on a Motion to Dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) by Defendant Nissan North America, Inc. ("NNA") (Filing No. 49). Also pending before the Court is NNA's Motion for Oral Argument on the Motion to Dismiss, (Filing No. 63), and Motion for Leave to File Response to Notice of Supplemental Authority, (Filing No. 65). Plaintiff Coyle Nissan, LLC ("Coyle") initiated this action asserting claims for breach of contract, breach of fiduciary duty, and other statutory and common law claims against NNA, arising out of the parties' automobile manufacturer-dealer relationship. NNA asks the Court to dismiss all claims asserted against it with the exception of the breach of contract claim. For the following reasons, NNA's Motion to Dismiss is **granted in part and denied in part**, the Motion for Oral Argument is **denied**, and the Motion for Leave to File Response is **granted**.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of Coyle as the non-moving party. *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Coyle is an Indiana limited liability company that operates an automobile dealership in Clarksville, Indiana. Clarksville is located within the Southern District of Indiana and is a few miles north of Louisville, Kentucky.  NNA is a distributor of new Nissan motor vehicles and automotive products (Filing No. 46 at 1).  On July 11, 2012, NNA and Coyle entered into a Nissan Dealer Sales and Service Agreement ("Dealer Agreement") (Filing No. 46-1).  When the parties entered into the Dealer Agreement, Coyle's dealership facilities in Clarksville did not meet NNA's facility requirements, so NNA required Coyle to locate and acquire other real estate approved by NNA for the construction of a new Nissan dealership Coyle was to build.  The Dealer Agreement granted Coyle the right to operate from its existing facilities as a temporary location until permanent facilities could be established.  It also established a timeline for certain activities to be accomplished to transition from the temporary facilities to the approved permanent facilities. Coyle was required to identify a new dealership site that would meet NNA's facility requirements by September 1, 2013; acquire that site by March 1, 2014; begin facility construction by July 1, 2014; complete construction of the new facilities and cease dealership operations at its temporary facilities by June 30, 2015.  *Id.* at 8–9.

The Dealer Agreement contained the following provisions. Coyle had to obtain NNA's approval of the new site. The Dealer Agreement defined an "approvable site" as an "exclusive, separate and distinct (stand-alone)" NNA dealership facility of a size, appearance, and layout requiring NNA's approval. *Id.* at 9. NNA called its facility guidelines the "Nissan Retail Environmental Design Initiative" or "NREDI." *Id.*  After Coyle built an NREDI-compliant facility a variety of incentives would be available from NNA (Filing No. 46 at 3).

In September 2013, Coyle identified a parcel of land of sufficient size to allow for the construction of a NREDI facility.  The land had significant visibility from Interstate 65.  Before

submitting its formal proposal to NNA, Coyle discussed with NNA the potential proposed site, but NNA verbally rejected it. *Id.* at 3–4. Coyle then obtained an option on an undeveloped piece of property east of Interstate 65, which NNA also rejected. NNA indicated it preferred a location to the west of Interstate 65. *Id.* at 4.

Coyle commissioned a site analysis performed by the Anderson Economic Group. The site analysis report considered three prospective sites for the new dealership location. The report's conclusion was that Coyle's preferred site was the best option. *Id.*; [Filing No. 46-2](). Coyle then formally submitted its original site proposal to NNA on September 17, 2013 ([Filing No. 46 at 4](); [Filing No. 46-3]()). NNA again rejected Coyle's proposal by correspondence dated November 27, 2013, indicating the site was not approvable and would not be considered by NNA ([Filing No. 46-4]()). NNA informed Coyle that it had performed its own market analysis by a qualified economic analysis firm, but NNA did not share its analysis with Coyle despite numerous requests from Coyle to do so. ([Filing No. 46 at 4]().)

In a letter dated December 15, 2014, NNA again denied a second request from Coyle to approve the original site proposal. NNA explained that the Anderson Economic Group study arbitrarily weighed the variables included in its analysis, so NNA rejected its conclusions, instead relying on the expertise of NNA's own consultant as well as its own observations and professional experience ([Filing No. 46-5]()).

After NNA's second denial, Coyle and NNA searched the market but could not find another site that was affordable and large enough to accommodate a NREDI-compliant facility ([Filing No. 46 at 5]()). Throughout the process, NNA offered and executed amendments to the Dealer Agreement with Coyle, extending the deadlines for Coyle to identify an approvable site; complete the acquisition of the site by April 15, 2017; schedule and complete a design consult by May 1, 2017;

submit final architectural plans for NNA's approval by July 1, 2017; and commence construction of the new facilities by October 1, 2017. If these conditions were met, the Dealer Agreement would be extended by eighteen months (Filing No. 46-6 at 1–6; Filing No. 46-1; Filing No. 46-4; Filing No. 46-5).

On April 20, 2017, more than three and a half years after Coyle first proposed it, NNA approved the original site for Coyle to build the new permanent facilities. This was the same site that NNA had twice rejected. Because NNA had delayed approval of the site, Coyle was forced to operate for more than three and a half years out of the temporary facility that was inferior and in a location that was undesirable (Filing No. 46 at 5).

Coyle learned that NNA offers a certain incentive program only available to certain dealerships that NNA selects as preferred dealers. NNA has not provided information about this selective incentive program to Coyle or to many other NNA dealerships in the Louisville, Kentucky market area. Because NNA has not informed Coyle how a dealership qualifies for this incentive program, Coyle is not aware of any established criteria to qualify for the selective incentives. Thus, Coyle has not qualified to receive the selective incentives. However, other similarly situated dealerships have qualified for and participated in the incentive program. (Filing No. 46 at 13.)

Coyle has lost actual sales of new NNA motor vehicles to a competing same line-make NNA dealer in the Louisville metropolitan market because the competing dealer was a preferred dealer under the incentive program, which was not known or made available to Coyle. The incentive program allowed the preferred dealer to provide retail customers pricing below Coyle's wholesale price of NNA new motor vehicles through upfront cash payments or quarterly payments made by NNA to the preferred dealer. *Id.* at 18–19.

## II.  <u>LEGAL STANDARD</u>

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

"When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Furthermore, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation and quotation marks omitted).

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

When considering a motion to dismiss, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

### III. <u>DISCUSSION</u>

NNA asks the Court to dismiss all the claims asserted against it with the exception of the breach of contract claim. It also asks the Court to allow oral argument on the Motion to Dismiss and requests leave to file a response to Coyle's notice of supplemental authority as it relates to the Motion to Dismiss. The Court will address each of the Motions in turn.

**A.     Motion for Oral Argument and Motion for Leave to File Response**

In its Motion for Oral Argument, NNA asserts that Coyle's Amended Complaint contains many allegations and twelve claims that involve complex issues of federal and state law. NNA asserts, "[o]ral argument on the Motion to Dismiss would assist the Court in assessing the merits of the parties' arguments, and would ensure that the Court has all the necessary information before it to rule on the Motion to Dismiss." (Filing No. 63 at 1.) The parties' briefs in support of or in opposition to the Motion to Dismiss have provided the Court with all the necessary information required to assess the merits of the parties' arguments and to decide the Motion to Dismiss. Therefore, NNA's Motion for Oral Argument is **denied**.

On January 23, 2019, NNA filed its Motion to Dismiss with its supporting Brief. On February 28, 2019, Coyle filed its Response Brief, opposing the Motion to Dismiss. On March 14, 2019, NNA filed its Reply Brief. Then on May 22, 2019, Coyle submitted a Notice of Supplemental Authority, bringing to the Court's attention a May 6, 2019 court decision from an Ohio state court case against NNA (Filing No. 64). The Ohio state court case involved a motion to dismiss a breach of fiduciary duty claim brought by a car dealership against NNA.

NNA argues in its Motion for Leave to File Response to Notice of Supplemental Authority that Coyle has not identified any authority authorizing the filing of its Notice of Supplemental Authority. The Local Rules contemplate a brief in support of a motion, a response, and a reply, and those briefs have been filed regarding NNA's Motion to Dismiss.  NNA argues that Coyle's Notice of Supplemental Authority should be stricken, or NNA should be allowed to file its attached response so that it has a fair opportunity to respond to the new authority. NNA submitted its proposed response to the supplemental authority at Filing No. 65-1 and Filing No. 66.  Coyle did not object to NNA's Motion for Leave to File Response.  In the interest of fairness and justice, the

Court **grants** NNA's Motion for Leave to File Response and will consider NNA's response to Coyle's supplemental authority.

**B.**    **Motion to Dismiss**

Coyle has asserted the following claims against NNA in its Amended Complaint: breach of contract (Count I), failure to bargain in good faith and deal fairly (Count II), violation of California law – covenant of good faith (Count III), breach of fiduciary duty (Count IV), violation of Indiana Code § 23-2-2.7-2(1)(iv) (Count V), violation of Indiana Code § 23-2-2.7-2(5) (Count VI), violation of Indiana Code § 9-32-13-8 (Count VII), violation of Indiana Code § 9-32-13-13 (Count VIII), violation of Indiana Code § 9-32-13-27 (Count IX), violation of 15 U.S.C. § 1221 (Count X), violation of the Robinson-Patman Act, 15 U.S.C. § 13(a) (Count XI), and declaratory judgment (Count XII). Each of these claims arise out of Coyle's allegations that: (1) NNA arbitrarily and unjustifiably, and without good business reason, rejected Coyle's proposals for the site of the permanent facilities only to, years later, approve the same location at a delay, injury, and loss to Coyle; and (2) NNA offered a selective incentive program only to certain preferred dealers and has not offered this incentive program to Coyle, which has resulted in Coyle losing actual sales of new NNA motor vehicles to a competing same line-make NNA dealer in the same market area.

With the exception of the breach of contract claim, NNA moves to dismiss all of the claims against it. NNA argues that the claims should be dismissed because, among other things, Coyle has failed to sufficiently plead facts to support plausible claims.

**1.**    **Counts VII, VIII, IX, and XII – Indiana Dealer Services Act**

NNA argues that the Court must dismiss the claims asserted under Indiana Code §§ 9-32-13-8, 9-32-13-13, and 9-32-13-27 (sections of the Dealer Services Act ("DSA")) because there is no private right of action under the DSA, Coyle failed to exhaust administrative remedies, and Coyle failed to plead facts to support a plausible claim.

NNA argues that the DSA does not provide a private right of action to allow Coyle to bring its claims to court. The DSA provides limited rights to dealers who complain of unfair practices by a manufacturer, none of which include the right to bring a private lawsuit in court. The DSA provides that, within thirty days of a notice of termination that a dealer believes is contrary to law, "the franchisee may protest the proposed action by bringing a declaratory judgment action before the division." Ind. Code § 9-32-13-27(d). The "division" is the Dealer Services Division within the office of the Indiana Secretary of State. Ind. Code § 9-32-2-11. Upon a timely and proper protest, "the division shall schedule an administrative hearing. The administrative hearing must comply with IC 4-21.5. The declaratory judgment action must include a determination of whether good cause exists for the proposed action." Ind. Code § 9-32-13-27(e).

The DSA allows a dealer to bring a similar administrative declaratory judgment action before the division to protest a relocation or add-point within an existing dealer's relevant market area. Ind. Code § 9-32-13-24(e). Aside from these limited administrative declaratory judgment rights, the only other statutory remedy provided under the DSA is a complaint to the division accompanied by a demand for mediation. Ind. Code § 9-32-16-15. These complaints are investigated by the division under its authority pursuant to Indiana Code § 9-32-16-14, and if the Secretary of State finds a violation, it may issue an order, including an enforcement action. Ind. Code § 9-32-16-2. Possible enforcement actions include restricting, suspending, or revoking a license; imposing a fine; and ordering restitution. In addition to taking this administrative

enforcement action, the division may also initiate a court action to seek an injunction and enforce compliance with Indiana Code § 9-32-13. Ind. Code § 9-32-16-13. The statute provides the division with numerous rights including investigatory powers, the right to compel witness testimony, and the right to seek an injunction in Indiana state court. Ind. Code §§ 9-32-16-13, 9-32-16-14. However, the DSA does not provide for a court action or lawsuit by a private plaintiff dealer.

NNA argues that the Court should not read into the DSA an implied private right of action because the statute provides a comprehensive scheme to protect the rights afforded under the statute. NNA points to the Indiana Supreme Court's decision in *LTV Steel Co. v. Griffin*: "As a general rule, a private party may not enforce rights under a statute designed to protect the public in general and containing a comprehensive enforcement mechanism." 730 N.E.2d 1251, 1260 (Ind. 2000). The question of whether a private right of action exists focuses on whether the legislature intended to create such a private right. NNA argues the legislative intent suggests no private right of action under the DSA.

"When a statute expressly provides one enforcement mechanism, courts may not engraft another." *Doe v. Ind. Dep't of Child Servs.*, 81 N.E.3d 199, 204 (Ind. 2017). In this case, the DSA provides for numerous enforcement mechanisms, including certain administrative actions before the division, as well as broad investigatory and enforcement powers for the division. NNA also asserts that the explicit private right of action in a related statute suggests that the legislature did not intend to imply a private right of action in the DSA. Indiana Code § 23-2-2.7-4 provides a right to file a private lawsuit for violations of the Indiana Deceptive Franchise Practices Act. "If the legislature intended to provide for a private right of action to enforce [the DSA], it could have explicitly done so." *Kimrey v. Donahue*, 861 N.E.2d 379, 383 (Ind. Ct. App. 2007).

In response, Coyle argues that the legislature intended to create a private right of action for violations of the DSA because the statute provides for private benefits for particular individuals. The legislature directly conferred a private benefit to a private party—automobile dealers—under the DSA. The DSA provides protections and rights to automobile dealers concerning unfair practices by automobile manufacturers. The statute does not indicate that it is intended to benefit the public in general; rather, it addresses unfair practices by manufacturers against dealers.

Coyle asserts that a "private cause of action generally will be inferred where a statute imposes a duty for a particular individual's benefit." *Whinery v. Roberson*, 819 N.E.2d 465, 474 (Ind. Ct. App. 2004). Coyle further asserts that where a private right of action is not explicitly stated in the statute, courts determine the legislature's intent by examining whether the statute "confers a public benefit, a private benefit, or both." *Galloway v. Hadley*, 881 N.E.2d 667, 672 (Ind. Ct. App. 2008). Coyle argues when a statute confers a private benefit exclusively or in tandem with a public one, courts must conclude the legislature intended for a private right of action. Coyle argues, because the DSA confers a private benefit on car dealers, the statute provides for a private right of action.

NNA replies that the DSA does not provide a private cause of action to dealers. Rather, the DSA allows dealers to pursue an administrative action with the Dealer Services Division within the office of the Indiana Secretary of State. The provisions of the DSA indicate that the legislature intended the statute to be enforced by the division, not by individual private plaintiffs.

NNA contends that Coyle's argument—if a statute confers a private benefit then it also creates a private right of action—is only part of the analysis. The ultimate question is legislative intent. NNA points the Court to another Indiana Supreme Court decision:

> Courts have developed certain rules for attempting to divine legislative intent in these circumstances. A broad formulation of these rules is that a private cause of

> action generally will be inferred where a statute imposes a duty for a particular individual's benefit but will not be where the Legislature imposes a duty for the public's benefit. *Americanos v. State*, 728 N.E.2d 895 (Ind. Ct. App. 2000), *transfer denied*, 741 N.E.2d 1254. But this formulation barely crosses the starting line before a series of interpretative questions arise. How do we know when a duty is imposed for a particular individual's benefit? For the public's benefit? What happens when it seems as if the duty is imposed for both?
>
> We are able to sidestep these types of questions here. While an argument can be made that the duties imposed on the DOC in these prison discipline statutes are for the public's benefit, the stronger argument seems to us to be that these duties are imposed for the benefit of the inmates, and, in any event, we assume they are. But even if that be so, the question here is ultimately one of legislative intent, and we find that the Legislature does not intend that inmates have a private right of action to enforce these statutes.

*Blanck v. Ind. Dep't of Corr.*, 829 N.E.2d 505, 509–10 (Ind. 2005).

NNA argues that it is clear the legislature did not intend to provide a private right of action to bring a lawsuit for violations of the DSA even if the statute confers some benefits to private actors. The legislature has promulgated a comprehensive set of rules providing for enforcement of the statute by the division. NNA asserts this remedy shows the legislature's intent that the division, through its enforcement and investigatory powers and limited administrative proceedings, is the proper forum for resolution of a dealer's complaint of violation of the DSA.

The Court agrees with NNA that the DSA does not provide a private right of action. The DSA authorizes complaints and petitions to the division, and it further creates broad enforcement mechanisms and grants broad enforcement powers to the division. The sole case the Court could find that directly addresses a claim under the DSA involved car dealerships that submitted a protest to the division, not to a court. The dealers' declaratory judgment protest was presented to the division in accordance with the DSA. Then judicial review of the administrative declaratory judgment was sought, with the Indiana Secretary of State as a party to the action. *See West v. Office of Ind. Sec'y of State*, 54 N.E.3d 349 (Ind. 2016); *West v. Office of Ind. Sec'y of State*, 41

N.E.3d 704 (Ind. Ct. App. 2015) (court was asked to decide whether the division's interpretation of a statutory definition was reasonable under the DSA). The statutory provisions and the *West* case suggest the legislature intended to place enforcement powers in the division, not through a private right of action.

The Court's finding is bolstered by the Indiana Court of Appeals in a recent decision addressing a claim under the Indiana Deceptive Consumer Sales Act. There, the Court of Appeals stated, "the Complaint described the alleged unfair practice by quoting a statutory provision from the Indiana Motor Vehicle Dealer Services Act, Indiana Code Section 9-32-13-7. That statute, which may be enforced by the Indiana Secretary of State, provides . . . ." *Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 617 (Ind. Ct. App. 2019). The Court of Appeals acknowledged that the DSA is enforced by the Secretary of State through the division, not by private plaintiffs.

Because the DSA does not provide a private right of action, NNA's Motion to Dismiss Counts VII, VIII, and IX is **granted**. To the extent that Count XII seeks a declaratory judgment based upon the DSA, that claim also is **dismissed**.

### 2.     <u>Counts V, VI, and XII – Indiana Deceptive Franchise Practices Act</u>

Next, NNA argues that the Court should dismiss the claims asserted under Indiana Code §§ 23-2-2.7-2(1)(iv) and 23-2-2.7-2(5) (sections of the Indiana Deceptive Franchise Practices Act ("the Act")) because the Dealer Agreement is not a "franchise" for purposes of the Act. Under the Act, a franchise is "any agreement meeting the provisions of IC 23-2-2.5-1, clauses (a)(1) and (2) which relates to the business of selling automobiles and/or trucks . . . ." Ind. Code § 23-2-2.7-5. Indiana Code § 23-2-2.5-1(a)(1) explains that a franchise is a contract by which "a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor."

NNA argues that Coyle does not operate under a marketing plan or system prescribed in substantial part by NNA, and thus, it is not a franchise. NNA asserts the Dealer Agreement is a "personal services agreement" under which Coyle is to "endeavor to fulfill its responsibilities through aggressive, sound, ethical selling practices," based on NNA's reliance on the "personal qualifications, expertise, reputation, integrity, experience, [and] ability" of Coyle's owners as marketers of Nissan motor vehicles (Filing No. 46-1 at 1). The Dealer Agreement states that Coyle "shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail (and if Dealer elects, the leasing and rental) of Nissan Vehicles to customers located within Dealer's Primary Market Area." *Id.* at 21. Furthermore, Coyle must "establish and maintain its own advertising and sales promotion programs." *Id.* at 29. Based on the allegations and the language of the Dealer Agreement, NNA argues that Coyle's contract is not a franchise, so Coyle cannot bring claims under the Indiana Deceptive Franchise Practices Act.

NNA additionally argues that Counts V and VI are only supported by general allegations of misconduct that conclusorily state the statutory provisions but fail to provide factual content to support plausible claims. Indiana Code § 23-2-2.7-2(1)(iv) protects franchisees against prejudicial acts of "threatening to cancel or fail to renew any agreement between the franchisee and the franchisor." The provision allows notice in good faith to a franchisee that it has violated the franchise agreement. NNA argues that the Amended Complaint has no allegations that NNA threatened to cancel or fail to renew the Dealer Agreement. NNA asserts that the documents attached to and incorporated in the Amended Complaint show that NNA cooperated with Coyle in its efforts to find a suitable location for the permanent facilities and also executed amendments to extend contract deadlines. This is not, NNA argues, a prejudicial act of threatening to cancel or not renew the Dealer Agreement, so Count V must be dismissed.

As to Count VI, NNA argues that Indiana Code § 23-2-2.7-2(5) prohibits unfair discrimination among franchisees who are similarly situated. But the Amended Complaint fails to allege that NNA's decisions regarding site approval constituted discriminatory treatment among similarly situated Nissan dealers. NNA asserts that Coyle failed to identify any other similarly situated Nissan dealer or facts about the "various economic programs" and how Coyle was denied participation in the programs. While Coyle repeated the elements of a discrimination claim, it offered no facts suggesting its claim is plausible or giving NNA notice as to what acts were supposedly discriminatory as compared to other Nissan dealers. NNA argues that there are no allegations suggesting "unfair" discrimination as opposed to neutral criteria to qualify for economic programs available to all Nissan dealers.

Coyle responds that the Dealer Agreement meets the definition of a franchise under the Act because the Dealer Agreement imposes on Coyle many advertising and marketing provisions in order for Coyle to be an authorized NNA dealer. Coyle argues that the Dealer Agreement gives NNA control over where Coyle's dealership is located, establishing Coyle's marketing area and evaluating Coyle's performance, evaluating Coyle's sales personnel, mandating Coyle's participation in used car sales, requiring Coyle's written materials to state it is an authorized NNA dealer, mandating Coyle's sales personnel to attend NNA trainings, and prescribing how Coyle may use NNA trademarks ([Filing No. 46-1 at 20](#)–22, 28, 31–32).

The Dealer Agreement provides that NNA will "establish and maintain comprehensive advertising programs" and provide Coyle with "advertising, sales promotion and sales campaign materials." *Id.* at 28–29. It requires Coyle to always "have available in showroom ready condition at least one vehicle in each model line of Nissan Vehicles for purposes of demonstration to potential customers." *Id.* at 29. In addition, the Dealer Agreement requires that Coyle, "at its

expense, display at its Dealership Location, in such number and at such locations as [NNA] may reasonably require, signs which are compatible with the design standards established by [NNA] and published in [NNA's] Manuals or Instructions," and the use of any signs are "subject to [NNA's] approval . . . ." *Id.* Coyle argues that these provisions clearly indicate the Dealer Agreement is a franchise under the Indiana Deceptive Franchise Practices Act because NNA prescribes in substantial part the marketing plan or system for Coyle.

Coyle argues that NNA demands too high a standard at this stage of the litigation. At this stage, Coyle need not plead specific facts or prove its claims but rather only provide a short and plain statement of its claims. Coyle asserts that NNA's argument primarily consists of asking the Court not to believe the allegations of the Amended Complaint, but that is not appropriate when considering a motion to dismiss.

Concerning Count VI, Coyle argues the Amended Complaint adequately pleads a discrimination claim. It alleges that NNA's actions denied Coyle the opportunity to participate in "various economic programs sponsored by Nissan that have been available to other similarly situated dealerships." *Id.* at 13. It further alleges that denying Coyle those opportunities constitutes "discriminat[ion] against Coyle as compared to other similarly situated dealer franchisees," and NNA's actions constituted "discriminating unfairly among franchisees similarly situated." *Id.*

A review of the allegations and the provisions of the Dealer Agreement reveals that dismissal of the claims under the Act at this stage of the litigation is unwarranted. The Amended Complaint states clearly that "Nissan threatened to terminate Coyle's franchise and sought to compel Coyle to approve a permanent facility site that was not reasonable or economically feasible, without just cause." (Filing No. 46 at 12.) Further, "Nissan's actions included threats that

Nissan would not provide Coyle with a permanent Dealer Sales and Service Agreement unless Coyle proposed a site within the areas Nissan preferred and identified to Coyle pursuant to Article Twelfth of the Franchise Agreement as amended." *Id.* Additionally, "Nissan's actions included threats that Nissan would terminate Coyle's franchise unless Coyle proposed a site within the areas Nissan preferred and identified to Coyle." *Id.*

The Dealer Agreement contains sufficient provisions allowing NNA to prescribe in substantial part the marketing plan or system of Coyle's business that the agreement can qualify as a "franchise" under the statute. The statute does not require a "franchise" to give exclusive marketing control to the franchisor. Rather, a franchise is a contract by which "a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor." Ind. Code § 23-2-2.5-1(a)(1). While Coyle has some marketing control and discretion, NNA also retains substantial control over the marketing of its goods through Coyle's dealership. The examples of marketing control retained by NNA that are noted above in Coyle's argument support the Court's conclusion that the Dealer Agreement is a "franchise" for purposes of the statute.

Concerning Count V, while the documents attached to and incorporated in the Amended Complaint indicate there may have been some level of cooperation by NNA and that deadline extensions were granted, the allegations of the Amended Complaint indicate there was some level of threatening to terminate Coyle's franchise and threatening to not provide a permanent franchise agreement unless Coyle met NNA's demands. These allegations are enough to plead a claim under the Deceptive Franchise Practices Act. In this case, the nature of the "dispute" between the Amended Complaint and the attached exhibits does not negate the allegations in the Amended Complaint. The exhibits attached to the Amended Complaint do not provide facts that

conclusively and diametrically contradict the factual allegations in the Amended Complaint such as would be the case if the pleading stated a contract was entered on a particular date and the attached contract stated a different date. The difference between the Amended Complaint and the attached exhibits does not concern hard data, but rather, the quality of the working relationship between the parties. Because the Court must accept as true the allegations in the pleadings at this stage of the litigation, the Court concludes Coyle has sufficiently alleged a claim under Count V.

Regarding Count VI, NNA's argument improperly demands detailed, comprehensive facts concerning the alleged unfair discrimination claim. That is not required to survive a motion to dismiss. Coyle has alleged basic facts regarding economic programs sponsored by Nissan that have been available to other similarly-situated dealerships and that were not provided to Coyle, and Coyle's Amended Complaint further alleges that such discrimination was unfair among similarly-situated dealerships. This is enough to move beyond the pleadings stage of the litigation. NNA's Motion to Dismiss Counts V and VI is **denied**. To the extent that Count XII seeks a declaratory judgment regarding the Indiana Deceptive Franchise Practices Act, that claim also may move forward.

### 3. <u>Count IV – Breach of Fiduciary Duty</u>

In Count IV of its Amended Complaint, Coyle alleges that NNA breached its fiduciary duty owed to Coyle by failing to use good faith when it did not approve Coyle's original site proposal and then years later approved the original site proposal. Coyle had placed its trust and confidence in NNA to exercise good faith when approving the new facility site location thereby placing NNA in a superior position. Coyle alleges NNA breached that duty to Coyle's detriment.

NNA argues that there is no fiduciary relationship between Coyle and NNA, so there can be no breach of a fiduciary duty. NNA explains that the Amended Complaint alleges Coyle

negotiated an agreement to purchase a Nissan dealership and then entered into the Dealer Agreement with NNA. Coyle further engaged its own economics expert to analyze site proposals to assist in Coyle's negotiations with NNA over the permanent dealership location. The provisions of the Dealer Agreement explicitly predicated on Coyle's expertise and included provisions that anticipated divergent motives and disputes between Coyle and NNA. The Dealer Agreement also stated that it did not make Coyle an agent or legal representative of NNA.

NNA asserts, "[W]here two seasoned commercial entities engaged in arms length business transactions, there are generally no fiduciary duties created." *Ray Skillman Oldsmobile & GMC Truck, Inc. v. GMC*, 2006 U.S. Dist. LEXIS 26142, at *16 (S.D. Ind. Mar. 14, 2006) (citing *Epperly v. Johnson*, 734 N.E.2d 1066, 1076 (Ind. App. 2000). NNA also directs the Court to another case involving NNA where the court dismissed a similar breach of fiduciary duty claim under the Dealer Agreement. *See Bedford Nissan, Inc. v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 149762, at *30–34 (N.D. Ohio Oct. 28, 2016). In that case, the court dismissed the claim because the Dealer Agreement and statutes did not create a fiduciary relationship between NNA and the dealership.

NNA argues,

> The only language in the NDSSA [Dealer Agreement] Plaintiff cites in support of NNA's purported fiduciary duty is the provision in the Franchise Agreement allowing NNA to approve or disapprove the new dealership land and site. But Plaintiff offers no reason to suggest that this provision is anything other than a standard aspect of the commercial franchisor-franchisee relationship between NNA and Coyle. The law is clear that there is no fiduciary duty in standard commercial relationships such as the arrangement between Plaintiff and NNA as alleged in Plaintiff's Amended Complaint. Count IV must be dismissed for failure to state a claim.

(Filing No. 50 at 34.)

Coyle responds that, "[a]s alleged in the complaint, it was NNA's initial failure to approve Coyle's proposed site in Indiana and then subsequent decision, almost four years later, to approve

that very same site that gave rise to NNA's breach of the fiduciary duty owed Coyle." (<u>Filing No. 57 at 29</u>.) Coyle argues that it has pled sufficient facts to support its fiduciary duty claim, including the allegation that it placed confidence and trust in NNA which had the superior position.

Coyle argues that a well-pleaded claim for breach of fiduciary duty should not be dismissed at the Rule 12 stage, pointing to *Wesleyan Pension Fund v. First Albany Corp.*, where the court declined to dismiss a constructive fraud claim on the basis that it should not "undertake to determine whether a fiduciary relationship in fact existed between the parties without a proper factual record." 964 F. Supp. 1255, 1273 (S.D. Ind. 1997). Coyle asserts that NNA's reliance on *Ray Skillman Oldsmobile* is misplaced because in that case the claim was dismissed because the contract specifically stated that no fiduciary duties were created under the contract, and such is not the case here. Coyle also notes that two other federal district courts have found a fiduciary relationship between a dealer and a car manufacturer. *See Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc.*, 2014 U.S. Dist. LEXIS 35909 (D. Mass. Mar. 18, 2014); *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 209 (S.D.N.Y. 2007).

In reply, NNA again asserts that no fiduciary relationship exists between the parties here. While the contract in *Ray Skillman Oldsmobile* contained language stating the contract did not create fiduciary duties, the court there also explained the general principle that "where two seasoned commercial entities engaged in arms length business transactions, there are generally no fiduciary duties created." *Ray Skillman Oldsmobile*, 2006 U.S. Dist. LEXIS 26142, at *16. Indiana law is clear: where "the parties' relationship consisted of a series of arm's length commercial purchase transactions," "there was no fiduciary relationship between the parties." *Richard I. Spiece Sales Co. v. Levi Strauss N. Am.*, 19 N.E.3d 345, 356 (Ind. Ct. App. 2014). NNA

points out that Coyle ignored the decision in *Bedford Nissan* where the court determined NNA did not have a fiduciary duty to a car dealership under the Dealer Agreement or under statute.

NNA asserts Coyle's reliance on *Wesleyan Pension Fund* is misplaced because that decision was based on the old pleading standard that has been replaced by *Twombly*. NNA argues Coyle's reliance on *Manhattan Motorcars* and *Aston Martin Lagonda* also is unavailing because in those cases, the courts noted "exceptional circumstances" involving the dealer placing a high degree of trust and confidence in the manufacturer by providing proprietary customer information to the manufacturer. But both of those courts also noted the general rule that arms length business transactions and franchisor-franchisee relationships do not impose fiduciary duties. Coyle has not provided proprietary customer information to NNA to create an exceptional circumstance in this case.

Coyle submitted a Notice of Supplemental Authority to apprise the Court of a May 2019 Ohio state court decision allowing a breach of fiduciary duty claim to move beyond the dismissal stage against NNA (Filing No. 64-1). The court there found that the car dealership was required to provide proprietary and confidential information to NNA, thereby creating a confidential relationship, and the contract also made the dealership dependent upon NNA for economic survival. The court also considered the obligations created by the Ohio Dealer's Act. It allowed the claim to move forward beyond the Rule 12 motion. NNA responds to the supplemental authority, asserting that an Ohio state court decision is not binding in this case, and the decision was based on Ohio law, which does not apply here. NNA further argues that the Ohio state court was mistaken in reaching its decision because there is no decision from any Ohio federal or state court of appeals recognizing the existence of a fiduciary relationship between an automobile manufacturer and a dealer.

The Court is persuaded that the breach of fiduciary duty claim must be dismissed. The Dealer Agreement is an agreement between two commercial entities, reached through arms length business transactions, and the parties have continued to negotiate various matters concerning their competing interests under the provisions of the agreement. The case law is clear that, as a general rule, these types of business relationships do not create a fiduciary relationship. Coyle has not alleged in its Amended Complaint that exceptional circumstances exist—such as the required disclosure to NNA of proprietary customer information—that might give rise to a special trust and confidence to support a fiduciary relationship. As Coyle has acknowledged, this claim is based on NNA's initial failure to approve Coyle's proposed site in Indiana and then subsequent decision, almost four years later, to approve that same site. This is the same basis for the breach of contract claim. NNA's contractual authority to approve Coyle's site selection does not create a special trust and confidence to support a fiduciary relationship. NNA's Motion to Dismiss Count IV of the Amended Complaint is **granted**.

4.    **Count XI – Robinson-Patman Act**

Count XI of the Amended Complaint alleges a claim for price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a) ("RPA"). The RPA makes it "unlawful for any person engaged in commerce . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a). To plead price discrimination under the RPA, a complaint must allege: "(1) at least two sales of commodities (2) by the same seller (3) to different purchasers (4) at different prices to persons in competition with each other (5) that have an anti-competitive effect." *Kundrat v. Chi. Bd. Options Exch., Inc.*, 2002 U.S. Dist. LEXIS 16908, at *17 (N.D. Ill. Sep. 4, 2002).

NNA argues that Coyle's RPA claim must be dismissed because "it fails to allege non-speculative, non-conclusory facts to support a claim of price discrimination, including a lack of basic facts concerning its competitors or any favorable prices or terms actually granted to them. Plaintiff also fails to allege facts in support of an interbrand anti-competitive effect." (Filing No. 50 at 35.) NNA asserts that to allege a plausible RPA claim, a plaintiff must allege the purchasers are in competition with each other in the same market and selling the same product. The allegations must include specific facts concerning the price discrimination and identify the putative competitors.

NNA argues that Coyle's Amended Complaint provides insufficient conclusory statements about Jeff Wyler ("Wyler"), a Louisville, Kentucky dealer, who is benefiting from an "Illegal Incentive Program." Coyle bases the claim on the conclusory and speculative assertions that Wyler's sales share increased in the two years after he purchased and began operating a dealership in Louisville. The Amended Complaint also cites a news publication about the incentive program alleged by a different Nissan dealer in the Cleveland, Ohio area. However, NNA argues, the allegations do not provide facts about the incentive program, how the incentives offered to Wyler differed from those offered to Coyle, or how the incentives benefited Wyler and harmed Coyle.

> Reduced to its essence, then, Plaintiff's Amended Complaint alleges simply that a news publication reported the mere allegations of another dealer about a supposed discriminatory incentive plan in another geographic area, and that a local competitor of Plaintiff had a "sales share" increase after he bought a nearby dealership. But no facts are alleged as to the preferential treatment actually offered to Wyler . . . .

*Id.* at 37.

NNA asserts that Wyler's "sales share" increase could be the result of better management, better service, more advertising and marketing, or other factors not related to an alleged "Illegal Incentive Program." Additionally, NNA argues, Coyle fails to plead facts concerning the price

charged by NNA that differs among competing dealers, the vehicles sold at differing prices, and the timing of discriminatory prices. "Because the Amended Complaint fails to allege a specific, identifiable difference in wholesale price of any commodities offered contemporaneously to Plaintiff and unidentified competitors, Count XI must be dismissed." *Id.* at 39.

NNA further argues that Coyle has failed to plead harm to interbrand competition; rather, Coyle appears to focus on its own personal harm in the form of lost sales. Coyle has not alleged any harm to competition between Nissan and other motor vehicle brands, thereby undermining the RPA claim. NNA asserts the Amended Complaint is devoid of non-conclusory allegations concerning the diversion of sales from a disfavored purchaser to a favored purchaser. Additionally, there are no allegations of substantial price discrimination between competitors over time, so the *Morton Salt* presumption is inapplicable. *See FTC v. Morton Salt Co.*, 334 U.S. 37 (1948).

In response, Coyle asserts that the RPA protects against both direct and indirect price discrimination. The RPA also protects against harm to both interbrand competition and intrabrand competition. "Direct discrimination occurs when a seller charges different prices to different buyers. Indirect discrimination occurs when one buyer receives something of value not offered to other buyers." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 521 (6th Cir. 2004) (citations and quotation marks omitted). Coyle argues that, "[w]hile interbrand competition may be the primary concern of the antitrust laws, it is not the only concern, particularly when discussing secondary-line violations," such as in this case. (Filing No. 57 at 33.) Coyle explains that the Supreme Court described a secondary-line, intrabrand claim in *Volvo Trucks*: "Secondary-line cases, of which this is one, involve price discrimination that injures competition among the discriminating seller's customers (here, Volvo's dealerships); cases in this category typically refer to 'favored' and

'disfavored' purchasers." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006).

Coyle argues in its Response Brief that it has properly pleaded the elements of an RPA claim under a secondary-line, intrabrand theory:

> Coyle pleaded that it "suffered an injury-in-fact and presumed injury as a result" of NNA's Illegal Incentive Program, which was unknown and not available to Coyle, and provided "upfront cash payments and/or quarterly payments, based upon sales incentives, to the Preferred Dealership," identified as Jeff Wyler NNA of Louisville ("Jeff Wyler"). (Am. Comp., PageID 324-25, ¶ 115). NNA's Illegal Incentive Program allowed the "Preferred Dealership [Jeff Wyler] to provide retail customers pricing <u>below</u> Coyle's wholesale price of NNA new motor vehicles" because of the cash payments it received through the Illegal Incentive Program." (*Id.*).

> The Amended Complaint also alleged that NNA's Illegal Incentive Program "provides sales incentives which effectively and realistically reduce the purchase price of the vehicle to NNA's Preferred Dealers, who in turn sell new NNA motor vehicles to retail customers at substantially lower cost than Coyle can sell to the consumer, in the same geographic market where Coyle and the Preferred Dealer compete to sell NNA motor vehicles (i.e. the Louisville, Kentucky metropolitan market area)." (*Id.*, PageID 325, ¶ 117,).

> The Amended Complaint further alleged that NNA "has covertly, arbitrarily, and illegally excluded Coyle from knowing about or participating in the Illegal Incentive Program. The Illegal Incentive Program is secret, and thus not reasonably available to Coyle. Further, there is no functional availability to Coyle to purchase NNA new motor vehicles at the same wholesale prices paid to NNA by the Preferred Dealerships in the Louisville, Kentucky metropolitan market." (*Id.*, PageID 325-26, ¶ 118,).

> The Amended Complaint explains "Coyle first became aware of the Illegal Incentive Program on or about February 8, 2016, when an article was published by *Automotive News* detailing another NNA dealer's . . . involvement in the Illegal Incentive Program . . . ." (*Id.*, PageID 326, ¶ 119). According to *Automotive News*, the purpose of NNA's Illegal Incentive Program is to transform NNA's dealer network by eliminating intra-brand competition among NNA dealers in certain markets. (*Id.* at ¶ 120). "NNA wants designated dealers (i.e. preferred dealers) who have 3-5 stores in metropolitan markets." (*Id.* at ¶¶ 119-120). Further, according to *Automotive News*, "the Illegal Incentive Program is aimed at increasing the U.S. market share of NNA's NNA and Infiniti brands by secretly and illegally promoting preferred dealers over all other authorized NNA franchisees in the market." (*Id.* at ¶ 121).

The price differential resulting from the Illegal Incentive Program "negatively effects competition and is specifically designed to substantially impair Coyle's ability to fairly compete against the Preferred Dealerships [Jeff Wyler] because of the very low profit margin on the sale of NNA new motor vehicles. Further, the Illegal Incentive Program is intended to transform NNA's dealer network by eliminating intra-brand competition among NNA dealers in certain markets." (*Id.* at ¶ 121). The Amended Complaint provided the names and "an overview geographically of Coyle NNA and the other same line-make NNA new motor vehicle dealerships in the Louisville, Kentucky metropolitan market area" and even provided a map showing those locations. (*Id.*, PageID 330-31, ¶ 138,).

. . .

The Amended Complaint explains that "[t]he fact that the Preferred Dealerships are receiving incentives from NNA, and Coyle is not, has created a difference in the net prices that Coyle and the Preferred Dealers pay to NNA for NNA new motor vehicles of like grade and quality, with the net wholesale prices that the Preferred Dealers pay being significantly lower than the prices paid by Coyle." (*Id.*, PageID 328, ¶ 127). The effect of NNA's Illegal Incentive Program cash payments "is to reduce the wholesale price that the Preferred Dealerships paid NNA to purchase NNA new motor vehicles." (*Id.* at ¶ 126).

(Filing No. 57 at 34–35, 37.)

Coyle argues that the allegations of the Amended Complaint sufficiently explain how it could not fairly compete and, as a result, lost sales in the same competitive market area for the same products because of the different pricing provided to Wyler through the "Illegal Incentive Program." The program's payments to Wyler skewed the Louisville metropolitan market area sales share towards Wyler after he entered the local market. Coyle went from a profitable NNA dealership to losing money after Wyler entered the local Louisville metropolitan market. Coyle has been directly injured, and competition between same line-make NNA new motor vehicle dealerships in the Louisville metropolitan market area has been impeded.

Coyle points out that the federal district court in Ohio in *Bedford Nissan*, 2016 U.S. Dist. LEXIS 149762, at *7–15, considered nearly identical factual allegations and a nearly identical

motion to dismiss by NNA, and the court determined that the RPA claim against NNA should survive the motion to dismiss.

In reply, NNA asserts that this case is not the same as *Bedford Nissan*. NNA explains that in *Bedford Nissan*, the plaintiffs sued NNA alleging that it had entered into a "secret alliance" with Bernie Moreno ("Moreno"), another Nissan dealer in Northeast Ohio, and had given him cash and quarterly incentive payments that were not available to all dealers. The plaintiffs in *Bedford Nissan* relied on the *Automotive News* article, and their complaint contained detailed allegations about the alleged incentive payments made specifically to Moreno. They alleged in detail that Moreno received something of value (specific amounts of cash and quarterly incentive payments tied to sales performance metrics, including dates and locations) not offered to other dealers. NNA argues that Coyle has not pleaded facts in its Amended Complaint similar to those that allowed the complaint in *Bedford Nissan* to survive a motion to dismiss. NNA asserts that, instead of pleading Coyle's competitors received specific amounts of cash and quarterly incentive payments tied to sales performance metrics, including dates and locations, Coyle has merely alleged the existence of a secret "Illegal Incentive Program" under which NNA provides indeterminate amounts of sales incentives to certain preferred dealers. NNA also argues that the *Bedford Nissan* plaintiffs were located in the same market area as the area noted in the *Automotive News* article. Coyle only speculates that the same "Illegal Incentive Program" is in effect in its market.

A careful review of the case law and arguments presented by the parties and the allegations of the Amended Complaint leads the Court to the conclusion that the RPA claim may move beyond the Rule 12 dismissal stage of this litigation. The allegations in the Amended Complaint provide enough facts to give NNA fair notice of what the claim is and the grounds upon which it rests. And the allegations must be taken as true at this stage. The factual allegations indicate a secondary-

line, intrabrand RPA claim where NNA provides Nissan vehicles to Coyle and other NNA dealers, including Wyler, in the Louisville metropolitan market. Through its incentive program made available only to preferred dealers such as Wyler, NNA indirectly discriminates between favored and disfavored purchasers, leading to differing prices for goods of like grade and quality. The allegations taken as true also indicate that the effect of this indirect discrimination may be to harm competition. As the court noted in *Bedford Nissan*, "To be sure, while the complaint allegations support an inference of injury sufficient to withstand a motion to dismiss at the pleading stage, Plaintiffs must ultimately provide *evidence* supporting an actual injury." 2016 U.S. Dist. LEXIS 149762, at *12–13. NNA's Motion to Dismiss Count XI is **denied**.

### 5. Count X – ADDCA Claim

Coyle brings a claim for violation of the Automobile Dealers Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*, in Count X of the Amended Complaint. The ADDCA provides a federal cause of action by an automobile dealer against an automobile manufacturer for damages sustained "by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise [agreement], or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. Under the ADDCA,

> The term "good faith" shall mean the duty of each party to any franchise [agreement] . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: [p]rovided, [t]hat recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

NNA seeks to dismiss this claim on the basis that the Amended Complaint fails to plead a lack of good faith and any coercion or intimidation on the part of NNA. NNA asserts that a lack

of good faith "requires a wrongful demand enforced by coercion or intimidation." *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 796 (7th Cir. 1989). NNA argues the pleadings are devoid of any allegations of coercion or intimidation or threats of termination. The Amended Complaint instead alleges NNA exercised its contractual right to approve or not approve Coyle's proposed site location; this is not coercion or intimidation.

Coyle responds that the Amended Complaint satisfies the pleading requirements to survive a Rule 12 motion. The allegations include:

> 104. Nissan, through its coercion, intimidation, and/or threats of termination has attempted to compel Coyle to approve a permanent facility site that was not reasonable or economically feasible and did so without just cause.
>
> 105. Nissan's actions of coercion, intimidation, and/or threats included not providing a permanent Dealer Sales and Service Agreement to Coyle and the threat of termination of the temporary Term Dealer Agreement unless Coyle proposed a site within the areas Nissan preferred and identified to Coyle.
> . . .
>
> 107. As a result of Nissan's violation of the ADDCA, Coyle has sustained and will sustain substantial damages in amounts to be determined at trial by a jury.

(Filing No. 46 at 16.) Furthermore, "Nissan threatened to terminate Coyle's franchise and sought to compel Coyle to approve a permanent facility site that was not reasonable or economically feasible, without just cause." *Id.* at 12. Coyle argues that these allegations are enough to support an ADDCA claim at the dismissal stage.

While the allegations supporting Count X create a close call on NNA's Motion to Dismiss, because of the legal standard at this stage of the litigation, the Court concludes that dismissal of the claim is not warranted. The allegations suggest that NNA may have made a wrongful demand in trying to dictate its own chosen site location rather than exercising its contractual right of "approval" of a site location, and it allegedly used threats of non-renewal of the Dealer Agreement

or not providing a permanent Dealer Agreement to do so.  At this stage, this is enough to support a lack of good faith under the ADDCA.  The Motion to Dismiss Count X is **denied**.

### 6.    <u>Counts II and III – Breach of Good Faith and Fair Dealing</u>

In Counts II and III of the Amended Complaint, Coyle asserts claims for failure to bargain in good faith and to deal fairly under Indiana law and breach of the covenant of good faith under California law.  NNA argues that these claims "are contradictory, simultaneously invoking the law of two different states as to the exact same issue, and provide no basis for relief independent of its breach of contract claim."  (Filing No. 50 at 44.)  NNA asserts that parties may choose in their contracts what state's law will apply, and the Dealer Agreement has a choice of law provision selecting California law and further explains that the contract was entered into in California (Filing No. 46-1 at 49).  Thus, NNA argues, Coyle's Indiana Uniform Commercial Code ("UCC") claim under Count II must be dismissed.  And under California law, while a covenant of good faith and fair dealing is implied in contracts, it "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000).  NNA concludes that if the Court allows Count II to proceed under Indiana law, then Count III must be dismissed to avoid application of the law of two jurisdictions to the same legal issue.

Coyle responds that federal courts sitting in diversity jurisdiction must apply the substantive law of the forum in which it sits, and Indiana's contractual choice of law provisions apply to the substantive law governing claims arising out of contract.  Coyle argues its two claims are valid because the Dealer Agreement was executed in Indiana and contains a California choice of law provision, so "both Indiana and California contract law claims were necessary and presented to the Court."  (Filing No. 57 at 45.)  Coyle asserts that it:

[P]roperly pleaded these claims that arise out of contract, but in order for this Court to review the state law claims, sitting because of diversity jurisdiction, the forum state's choice-of-law (i.e., Indiana) needed to be set forth. This allows the NDSSAs designation of substantive law (i.e. California), including the implied covenant of good faith and fair dealing, to be applied in this matter between NNA and Coyle. Thus, the Court should deny NNA's request to "limit" the contract-based causes of action and related claims.

*Id.*

NNA briefly replies that Coyle has not brought Count II to allow the Court to review state law claims under California law because of choice of law issues when sitting in diversity jurisdiction. Rather, "Coyle's allegations in Count II of its Amended Complaint concern the implied duty of good faith and fair dealing under the Indiana Uniform Commercial Code. None concern Indiana choice-of-law rules." (Filing No. 62 at 25.)

NNA's arguments are well-taken. The Dealer Agreement provides that contract claims are to be considered under California law, and Count II of the Amended Complaint clearly attempts to bring a separate substantive, contract-based claim under the Indiana UCC for breaching an implied duty of good faith and fair dealing. Therefore, the Court **grants** NNA's Motion to Dismiss Count II of the Amended Complaint. However, the Court concludes that the allegations have sufficiently pled a claim for violation of the covenant of good faith under California law to survive the Motion to Dismiss. Thus, the Motion is **denied** as to Count III.

## IV.  CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** NNA's Motion to Dismiss (Filing No. 49). Count I (the breach of contract claim) was not addressed in the Motion to Dismiss and will proceed. Counts II, IV, VII, VIII, and IX are **dismissed**. Counts III, V, VI, X, and XI may proceed. To the extent that Count XII seeks a declaratory judgment regarding the Indiana Deceptive Franchise Practices Act, that claim also may proceed.

NNA's Motion for Oral Argument on the Motion to Dismiss (Filing No. 63) is **DENIED**, and NNA's Motion for Leave to File Response to Notice of Supplemental Authority (Filing No. 65) is **GRANTED**.

     **SO ORDERED.**

Date: 3/26/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher DeVito
MORGANSTERN, MACADAMS & DEVITO CO., L.P.A.
ChrisMDeVito@gmail.com

Brad S. Keeton
STOLL KEENON OGDEN, PLLC
brad.keeton@skofirm.com

Evan Livermore
DORSEY & WHITNEY LLP
livermore.evan@dorsey.com

Joel T. Nagle
STOLL KEENON OGDEN, PLLC
joel.nagle@skofirm.com

Ronald C. Smith
STOLL KEENON OGDEN, PLLC
Ron.Smith@skofirm.com

William C. Wagner
TAFT STETTINIUS & HOLLISTER LLP
wwagner@taftlaw.com

Steven J. Wells
DORSEY & WHITNEY LLP
wells.steve@dorsey.com