UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| COYLE NISSAN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00075-TWP-TAB |
| | ) | |
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Nissan North America, Inc. ("NNA") (Filing No. 108). Plaintiff Coyle Nissan, LLC ("Coyle") initiated this action asserting claims for breach of contract, breach of fiduciary duty, and other statutory and common law claims against NNA, arising out of the parties' automobile manufacturer-dealer relationship. NNA now moves for summary judgment on the claims that survived a motion to dismiss (Filing No. 86). For the following reasons, NNA's summary judgment motion is **granted**.

## I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Coyle as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.  Factual Background

Coyle is an Indiana limited liability company that is in the car dealership business in the Clarksville/Jeffersonville, Indiana area.  NNA is a distributor of new Nissan motor vehicles and

automotive products (Filing No. 46 at 1; Filing No. 87 at 1).  In 2011, Coyle had discussions with Bales Motor Company ("Bales Motor") concerning the purchase of Bales Motor's Nissan franchise, which operated in Jeffersonville, Indiana.  On December 9, 2011, Coyle and Bales Motor entered into an asset purchase agreement, and Bales Motor notified NNA of the asset purchase agreement a few days later (Filing No. 126-2 at 1).

Bales Motor had been operating its Nissan dealership alongside its domestic brand dealerships at the same facility, but NNA wanted a standalone dealership facility that exclusively sold Nissan vehicles.  *Id.* at 1–2.  In 2010, NNA hired Urban Science, a market analytics and research firm, to conduct a market study of Bales Motor's market area.  Urban Science issued a report on Bales Motor and three other Louisville, Kentucky metropolitan Nissan dealers. The Urban Science report recommended relocating three of the four dealerships, including Bales Motor (Filing No. 126-1 at 2–76).  The market report recommended relocating Bales Motor to a "preferred location for representation [] in the vicinity of Hwy 131 in Clarksville, IN; west of I-65 and east of Blackiston Mill Rd., near Toyota and Honda." *Id.* at 62.

Shortly after purchasing Bales Motor's Nissan franchise, Coyle began looking for potential sites to build a standalone Nissan facility. Coyle discovered an available piece of commercial property located east of I-65 off of Veterans Parkway.  The site was next to the Jefferson Towne Center commercial development, which was then underway (the "Jeff Towne Center Site").  Coyle acquired an option to purchase the Jeff Towne Center Site in the event that NNA approved it. However, NNA's Midwest region market representative manager, Scott Compton ("Compton"), informed Coyle that Nissan is not a "pioneer brand," there was no growth on the east side of I-65, and the site contained an adult bookstore, so NNA would not approve the Jeff Towne Center Site.

Because NNA would not approve the Jeff Towne Center Site, Coyle let its option to purchase the site expire (Filing No. 126-2 at 2–4; Filing No. 126-3 at 1–2).

Before Coyle and NNA entered into an agreement, Compton informed Coyle that NNA wanted a dealership site west of I-65 because its primary competitors, Honda and Toyota, were located on that side of I-65. Coyle owns a Chevrolet dealership west of I-65 close to Honda and Toyota within NNA's preferred location. A large, open plot of land was available west of I-65 at the intersection of Broadway and Woodstock Drive, just off of Veterans Parkway and just south of Coyle's Chevrolet dealership (the "Broadway Site"). The Broadway Site was less than a mile away from the Toyota and Honda dealerships. Although Coyle did not own the Broadway Site at the time, Coyle was willing and able to acquire it if NNA approved. When Coyle proposed the Broadway Site to NNA, Compton informed Coyle that the Broadway Site was not approvable because of poor visibility and accessibility. *Id.*; Filing No. 109 at 2. However, Compton failed to inform Coyle that the Broadway Site was within the preferred area of the Urban Science market report and within NNA's preferred location. From 2012 through 2016, Coyle proposed the Broadway Site to NNA on several occasions, and each time, NNA refused to approve it (Filing No. 126-2 at 4). Coyle also proposed the site of its collision center located on Leisure Way just west of I-65 (the "Leisure Way Site") as a possible permanent location for the new Nissan dealership, but this too was rejected. *Id.* at 5, 23–24.

On July 11, 2012, NNA and Coyle entered into a Nissan Dealer Sales and Service Agreement ("DSSA") (Filing No. 46-1). When the parties entered into the DSSA, Coyle's dealership facilities in Clarksville did not meet NNA's facility requirements, so NNA required Coyle to locate and acquire real estate approved by NNA for the construction of a new Nissan dealership Coyle was to build. The DSSA granted Coyle the right to operate from its existing

3

facilities at the Leisure Way Site as a temporary location only.  The DSSA established a timeline for certain activities to be accomplished to transition from the temporary facilities to an approved permanent facility.  This required Coyle to identify a new dealership site that would meet NNA's facility requirements by September 1, 2013; acquire that site by March 1, 2014; commence facility construction by July 1, 2014; and complete construction of the new facilities and cease dealership operations at its temporary facilities by June 30, 2015.  *Id.* at 8–9.

The DSSA also required,

> In order for [Coyle] to provide competitive dealership facilities to effectively market Nissan Products and the Nissan brand, [Coyle] shall complete the acquisition (by purchase or long-term lease) of land located on a site approved by [NNA] so as to provide exclusive, separate and distinct (stand-alone) Nissan dealership facilities of a size, appearance and layout meeting [NNA]'s approval and in accordance with the Guides established by [NNA], all in accordance with final architectural plans to be submitted to [NNA] for approval (the "New Dealership Facilities"). [NNA] has developed facility guidelines for the size, appearance and layout of Nissan dealership facilities overall (hereinafter referred to as the "Nissan Retail Environmental Design Initiative" or "NREDI"). [NNA] will provide the guidelines to [Coyle]. [Coyle] agrees to provide NREDI-compliant New Dealership Facilities . . . .

*Id.* at 9.

In the DSSA, Coyle acknowledged that NNA relied on Coyle's "commitment to timely meet the facility obligations" for identifying and acquiring an NNA-approved site, and "failure by [Coyle] to meet them shall constitute a material breach of this Agreement." *Id.* at 10.  In the event of such failure, Coyle "freely and voluntarily agree[d] to sell all of its Nissan dealership assets or otherwise transfer its ownership interest in the Nissan dealership operations to a candidate approved by [NNA] in its reasonable discretion." *Id.*

The DSSA further specified, "[Coyle] shall provide, at the Dealership Location approved by [NNA] in accordance with Section 2.B hereof, Dealership Facilities that will enable [Coyle] to effectively perform its responsibilities under this Agreement," and "[Coyle] shall not move,

4

relocate, or change the usage of the Dealership Location or any of the Dealership Facilities . . . without the prior written consent of [NNA]." *Id.* at 20. Additionally, "[t]o assist [Coyle] in planning, establishing and maintaining the Dealership Facilities, [NNA], at the request of [Coyle], will from time to time make its representatives available to [Coyle] to provide standard building layout plans, facility planning recommendations, and counsel and advice concerning location and facility planning." *Id.*

In May 2013, NNA directed Coyle to focus its search for a site on the east side of I-65—its newly preferred location–rather than the west side, because NNA believed the west side would not be successful. On May 23 and 24, 2013, Coyle emailed NNA and requested NNA's market study data to explain the change for the preferred location from the west side to the east side of I-65.  Coyle repeatedly requested NNA provide Coyle with its market study data, and NNA assured Coyle that it would provide the market study data, but it never did (Filing No. 126-2 at 8, 20–21).

After NNA had announced its change in preferred location to the east of I-65, Coyle commissioned a site analysis performed by the Anderson Economic Group ("AEG"). The site analysis considered three prospective sites for the new dealership location: (1) the Broadway Site, (2) a site east of I-65 at Veterans Parkway and Hamburg Pike, and (3) the Leisure Way Site.  The conclusion in AEG's August 19, 2013 report was that Coyle's preferred site, the Broadway Site, was the best option (Filing No. 126-2 at 8–9; Filing No. 46-2).

Despite its efforts, Coyle was unable to identify any sites on the east side of I-65 that could accommodate an NREDI-compliant facility and that Coyle could afford.  More than a year after the DSSA was executed, and after the expiration of the deadline originally established for Coyle to identify a site that NNA could approve, Coyle formally requested NNA's approval of the Broadway Site by letter dated September 17, 2013.  Because NNA was interested in frontage on

Veterans Parkway, Coyle noted in the letter that it was in discussions with the Town of Clarksville to make the Broadway Site an extension of Veterans Parkway. Coyle also noted two other site options previously proposed but rejected by NNA: (1) the Leisure Way Site and (2) the Jeff Towne Center Site (Filing No. 126-2 at 9; Filing No. 46-3).

Approximately two months later, NNA sent a response to Coyle by letter dated November 27, 2013. NNA explained that the Broadway Site was not approvable and would not be considered. NNA noted that this was its position before the DSSA was executed as well as at the time the DSSA was signed by the parties. NNA's letter also emphasized some of Coyle's contractual obligations, and it suggested that an amendment to the deadlines might be appropriate (Filing No. 46-4). Around this same time, NNA began to warn Coyle that termination and divestiture were possible if Coyle did not secure a site in NNA's preferred location (Filing No. 126-2 at 9).

On March 26, 2014, Coyle and NNA executed an amendment to the DSSA. The amendment extended the deadlines for Coyle's performance under the contract. The amendment required Coyle to identify a site that would meet NNA's facility requirements by July 18, 2014; acquire that site by August 1, 2014; commence facility construction by January 9, 2015; and complete construction of the new facilities and cease dealership operations at its temporary facilities by December 1, 2015 (Filing No. 46-1 at 3–7).

On April 17, 2014, NNA informed Coyle it would soon conduct a market study of Coyle's area. Coyle responded by providing NNA with AEG's August 2013 report, which discussed a site at Veterans Parkway and Hamburg Pike, the Leisure Way Site, and the Broadway Site with the recommendation of the Broadway Site as the preferred location. In June 2014, Coyle met with Compton and Josh Beatty, another representative of NNA, to discuss NNA's rejection of Coyle's site proposals. Coyle was informed that NNA would terminate Coyle's franchise if it did not find

a site within NNA's preferred location. Coyle also was informed that NNA had conducted two market studies showing that east of I-65 on Veterans Parkway was NNA's preferred location (Filing No. 126-2 at 10, 57–72).  NNA's market analysis conducted by Urban Science in July 2014 indicated a preferred location east of I-65 with an acceptable alternative west of I-65 (Filing No. 133-5 at 48 (filed under seal)).

In July 2014, Coyle sent a letter to NNA to explain that Coyle's attempts to secure a site in NNA's preferred location had been unsuccessful. Coyle reiterated its proposal of the Broadway Site and its request for NNA's market study data (Filing No. 126-2 at 11, 39–41).

In a letter dated December 15, 2014, NNA again denied Coyle's request to approve the Broadway Site as the permanent location for the Nissan dealership. NNA noted that it was committed to continuing to work with Coyle to find a mutually acceptable permanent location, but NNA explained the Broadway Site was not appropriate or approvable because of poor visibility and accessibility.  NNA further explained that it had considered Coyle's AEG report, but the report had arbitrarily weighed the variables included in its analysis, so NNA rejected AEG's conclusions, instead relying on the expertise of NNA's own consultant as well as its own observations and professional experience. NNA's letter reiterated Coyle's contractual obligation to provide an approvable site, and it noted NNA's preferred locations to both the east and the west of I-65. NNA's letter also offered another extension of Coyle's deadlines: Coyle would need to identify a site that would meet NNA's facility requirements by March 31, 2015; commence facility construction by September 1, 2015; and complete construction by September 30, 2016 (Filing No. 140-6).

NNA's December 2014 letter to Coyle also asserted that NNA had studied Coyle's primary market area before Coyle became a Nissan dealer in 2012, and it had recommended a preferred location on Veterans Parkway east of I-65, which was discussed with Coyle before it became a

Nissan dealership (Filing No. 140-6 at 2). However, this was not the case as NNA's 2010 Urban Science market study had recommended a preferred location west of I-65 (Filing No. 126-2 at 11; Filing No. 126-1 at 62). Throughout 2014 and into 2015, NNA made oral threats of termination and divestiture if Coyle did not secure a site (Filing No. 126-2 at 13).

On April 7, 2015, CBRE, a commercial real estate firm, was retained by NNA, and it provided NNA with a list of recommended sites for Coyle, which NNA shared with Coyle.  NNA proposed three sites from the CBRE report: (1) a parcel that was a city park not available for sale, (2) a site that the developer restricted from being used for automobiles, and (3) a site adjacent to a Menards store off of Veterans Parkway and Towne Center Boulevard.  Coyle inquired about purchasing the site adjacent to Menards and negotiated with the property owner.  On June 15, 2015, NNA informed Coyle that it would approve the site.  However, on February 1, 2016, the Town of Jeffersonville (which encompasses sites east of I-65, including the site adjacent to Menards) enacted an ordinance imposing an immediate and temporary moratorium on new and expanding auto-related businesses.  The ordinance set a six-month moratorium. With the ordinance and moratorium in place, Coyle determined that it would have to look for a different site. In 2016, Coyle purchased the Broadway Site (Filing No. 126-2 at 13–15; Filing No. 126-6).

On November 18, 2016, NNA sent Coyle a notice of default, which formally threatened to terminate the DSSA because of Coyle's failure to timely identify a permanent site location and build a permanent facility.  NNA's notice provided a new schedule for Coyle to comply and perform under the contract. Coyle was required to submit for approval a site and facility plan within sixty days, commence construction within eight months, and complete construction within twenty months of the notice of default (Filing No. 126-2 at 16, 76–80).

A few months later, NNA informed Coyle that it would approve the Broadway Site as Coyle's permanent Nissan dealership location (Filing No. 126-2 at 16). NNA approved the Broadway Site as a concession to Coyle and in recognition of the limited real estate opportunities then available in the area as it had become clear that there was no readily available cost-effective alternative site that met NNA's requirements (Filing No. 110 at 1–2).

On April 19, 2017, Coyle and NNA executed a second amendment to the DSSA. The amendment extended the deadlines for Coyle's performance under the contract, and it also provided approval of the Broadway Site as the permanent location for the Nissan dealership. This second amendment required Coyle to complete the acquisition of the site by April 15, 2017; schedule and complete a design consult by May 1, 2017; submit final architectural plans for NNA's approval by July 1, 2017; and commence construction of the new facilities by October 1, 2017. If these conditions were met, the DSSA would be extended by eighteen months to allow for completion of the new facilities (Filing No. 46-6 at 1–5).

## B.  Procedural Background

On May 2, 2018, Coyle initiated this lawsuit by filing a Complaint against NNA (Filing No. 1). Then on January 2, 2019, Coyle filed an Amended Complaint (Filing No. 46). Coyle asserted the following claims against NNA in its Amended Complaint: breach of contract (Count I), failure to bargain in good faith and deal fairly (Count II), violation of California law – covenant of good faith (Count III), breach of fiduciary duty (Count IV), violation of Indiana Code § 23-2-2.7-2(1)(iv) (Count V), violation of Indiana Code § 23-2-2.7-2(5) (Count VI), violation of Indiana Code § 9-32-13-8 (Count VII), violation of Indiana Code § 9-32-13-13 (Count VIII), violation of Indiana Code § 9-32-13-27 (Count IX), violation of 15 U.S.C. § 1221 (Count X), violation of the Robinson-Patman Act, 15 U.S.C. § 13(a) (Count XI), and declaratory judgment (Count XII).

Following a motion to dismiss filed by NNA, the Court dismissed Counts II, IV, VII, VIII, and IX, and Coyle was permitted to pursue Counts I, III, V, VI, X, XI, and XII (Filing No. 86 at 31).   NNA then filed the instant Motion for Summary Judgment on Coyle's remaining claims (Filing No. 108).   The Court heard oral argument on the summary judgment motion on February 26, 2021, and a ruling was taken under advisement.

On February 25, 2021, Coyle filed a Motion for Leave to File Supplemental Pleading. (Filing No. 167). Shortly thereafter, the Court granted that motion. (Filing No. 197 at 15-18). The supplemental pleading to the Amended Complaint alleges:

> On February 13, 2021, almost three years after Coyle initiated this action and more than two years after Coyle filed the Amended Complaint, Coyle received a letter from NNA dated February 11, 2021, stating that NNA rescinded its approval of the dealership site and requested a written response outlining a new facility proposal and timeline. The rescission letter claims that the approved site had been substantially modified for use by a competing line-make, and, therefore, the facility plan could not be fulfilled.

(Filing No. 167-1).   Coyle alleges that NNA's claim "is materially false; only a small portion of the site has been paved with asphalt, and all of the land on the site remains available for use as the permanent location for a new Nissan facility."   *Id.*   Coyle argues that NNA's rescission of its approval of the dealership site, just like its delays in approving it from 2012 through 2017, constitutes a new and separate breach of the parties' agreement and is an additional violation of California's covenant of good faith and fair dealing. On April 27, 2021 NNA filed an Answer to Plaintiff's Supplemental Plead and Defendant's Counterclaim (Filing No. 198).  In this filing, NAA denied the allegations in the Supplemental Pleading and asserted seven Additional Affirmative Defenses and a two-count Counterclaim for (1) breach of contract and (2) request for declaratory judgment and order for specific performance and violation of California Law-Covenant of Good Faith.  *Id.* at 116–17.

On May 18, 2021, Coyle filed a Motion to Strike NNA's Additional Affirmative Defenses and Counterclaim, or, in the Alternative, to Dismiss (Filing No. 199). Following expedited briefing, that Motion is now ripe for ruling.

## II.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

NNA asks for entry of summary judgment on Coyle's remaining claims: breach of contract, breach of the covenant of good faith under California law, violation of Indiana Code § 23-2-2.7-2(1)(iv), violation of Indiana Code § 23-2-2.7-2(5), violation of 15 U.S.C. § 1221, violation of the Robinson-Patman Act, 15 U.S.C. § 13(a), and declaratory judgment.  The Court will address each of the claims in turn.

### A.   Breach of Contract

Pursuant to the DSSA entered into by the parties, all contract claims are governed by California law (Filing No. 46-1 at 49; Filing No. 86 at 31).  Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

NNA argues that the only element that is satisfied in this case is the existence of a contract.  NNA asserts that Coyle's claim that NNA breached the DSSA by rejecting the Broadway Site proposals and later approving the same site fails as a matter law, and there is no admissible evidence of damages to Coyle.

NNA asserts the DSSA provided discretion to NNA for deciding whether to approve any site location or building plans proposed by Coyle.  NNA's discretion was not without parameters

as the DSSA called for the location to be relative to the sales opportunities and service requirements of the primary market area, and Coyle's own market study agreed that visibility and accessibility were key factors in evaluating any proposed site. Any facilities proposal ultimately was subject to NNA's determination as to whether the site was satisfactory or approvable under NNA's applicable standards. NNA explains that it was not satisfied with Coyle's initial proposals for the Broadway Site primarily because of poor visibility and accessibility.

NNA argues that California law upholds "satisfaction clauses" as long as the contract reflects mutual obligations and consideration. *Mattei v. Hopper*, 330 P.2d 625, 626 (Cal. 1958). When a contract calls for "satisfaction as to commercial value or quality, operative fitness, or mechanical utility," a reasonableness standard is applied to determine whether the party whose duties are conditional upon satisfaction has adhered to the contract. *Id.* at 626–27. However, when the factors involved in determining satisfaction "are too numerous and varied to permit the application of a reasonable [person] standard," or when the contract calls for satisfaction involving "judgment," then the applicable standard is "good faith." *Id.* at 627. "[T]he promisor's determination that he is not satisfied, when made in good faith, has been held to be a defense to an action on the contract." *Id.*

NNA asserts that, in this case, the DSSA did not impose a duty on NNA to approve the Broadway Site. Given the broad discretion afforded to NNA under the DSSA to make complex decisions regarding the approvability of proposed site locations, NNA's good-faith expression of dissatisfaction with Coyle's site proposal is a sufficient defense to the breach of contract claim. NNA argues there is no evidence that its determination that the Broadway Site had significant detrimental aspects such as poor visibility and accessibility was in bad faith or that it was bad faith to continue looking for better real estate alternatives.

13

NNA points out that even Coyle's AEG report recognized the negative aspects of the Broadway Site though it attached less weight to these negative aspects. Even under a reasonableness standard, the parties agree that visibility and accessibility are key factors in the evaluation of a proposed dealership location, and NNA's business decision in 2013 regarding the approvability of the Broadway Site on the basis of poor visibility and accessibility was not a breach of the contract but was based on reasonable criteria.

In response, Coyle argues that material issues of fact regarding whether NNA acted reasonably or in good faith preclude entry of summary judgment on the breach of contract claim. Coyle argues that the evidence raises questions of NNA's reasonableness and good faith where NNA concealed its Urban Science market study data from Coyle, which showed Coyle's proposed site was within NNA's preferred area. The evidence shows NNA rejected several standalone sites in its preferred area that Coyle had proposed and that met NNA's NREDI criteria.  Coyle contends that NNA did not take into consideration AEG's market study report when conducting its market analysis even though the DSSA required it to do so.  Additionally, the evidence shows NNA refused to approve the Broadway Site for many years and then finally approved the site in 2017. Coyle argues that these issues raise a dispute concerning NNA's good faith and breach of contract.

NNA replies that Coyle was not contractually entitled to approval of any particular site or facility proposal, and Coyle has not pointed to any provision of the contract that NNA breached that caused it harm. There is no evidence that NNA's decision to approve the Broadway Site in 2017 rather than earlier was made in bad faith or that it was anything other than a reasonable exercise of business judgment. Coyle was told before even entering into the DSSA that the Broadway Site was not approvable because of access and visibility problems.  NNA approved the Broadway Site only after years of futile searching for a superior site.  NNA further argues that no

contract provision was breached when NNA did not share its market study data with Coyle, and the evidence clearly shows that NNA did take into consideration Coyle's AEG market study report when conducting its market analysis (*see* Filing No. 140-6 at 2).

After careful consideration of the parties' arguments and the designated evidence, the Court concludes that summary judgment is appropriate on the breach of contract claim. The DSSA is abundantly clear that the permanent dealership location had to be approved by NNA. The DSSA granted discretion to NNA when deciding whether to approve any particular site. NNA considered reasonable factors such as visibility and accessibility, sales opportunities, service requirements, and the facilities and location of NNA's nearby principal competitors when deciding to reject Coyle's site proposals, and those factors were communicated to Coyle. The evidence shows NNA approved the Broadway Site in 2017 because NNA realized no other reasonable options would become available after years of futile searching, not because of any bad faith or unreasonableness.

Furthermore, Coyle could not, under the contract, demand approval of any particular location. While NNA appears to have preferred the area west of I-65 and then changed the preferred area to the east of I-65, NNA communicated its preferred area and also noted alternative areas for the permanent location of the dealership to the east and west of I-65.  Even if a particular site was within the "preferred area," a particular site still could have been unacceptable based on a number of factors such as poor visibility and accessibility and comparisons to NNA's primary competitors in the area. NNA did not breach the DSSA when it exercised its contractual right to refuse approval of particular sites based on reasonable considerations.

The DSSA explained that from time to time NNA would make its representatives available to Coyle to provide counsel and advice concerning location and facility planning.  However, Coyle pointed to no provisions in the DSSA that required NNA to share all or specific market study data

with Coyle. Thus, NNA's failure to share specific market study data is not a breach of contract. The DSSA required NNA to notify Coyle if NNA was going to conduct a market area study. Coyle was contractually permitted to present information to NNA for the market study, and NNA was to consider all relevant information that was provided. NNA notified Coyle in April 2014 that it was going to undertake a market analysis. Coyle provided NNA with AEG's August 2013 report to consider in its study. NNA took into consideration Coyle's AEG market study report when conducting its market analysis, but NNA came to different conclusions. These facts and the designated evidence do not support a breach of contract on this basis. Therefore, the Court **grants** NNA's Motion for Summary Judgment on the breach of contract claim.

**B.**     **Breach of the Covenant of Good Faith Under California Law**

Regarding Coyle's claim for breach of the covenant of good faith and fair dealing under California law, NNA notes, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000) (emphasis in original). The covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.*

NNA argues it never interfered with Coyle's duty to identify an approvable property. Rather, NNA provided assistance with searching for sites, extended the contract deadlines, and ultimately made concessions to accept the Broadway Site that did not meet its standards. NNA asserts that disagreement about the importance of dealership location factors such as accessibility and visibility does not support a bad faith claim. Thus, NNA argues, summary judgment is appropriate on this claim.

Coyle raises the same argument in support of the breach of good faith claim as it raises for the breach of contract claim. It argues there is a dispute as to whether NNA acted in good faith when it did not share market study data with Coyle, it rejected many sites that were within its preferred area, and it refused to approve the Broadway Site for many years and then finally approved the site in 2017.

The designated evidence and the undisputed facts compel the same result for the claim of breach of the covenant of good faith and fair dealing and the claim of breach of contract. Pursuant to the DSSA, Coyle received the benefits of being a Nissan dealership, and it operated out of its temporary facilities while it searched for a site for the permanent location. NNA was within its contractual rights when it did not approve the Broadway Site or other sites proposed by Coyle that NNA had determined were inadequate. And rather than exercising its right to terminate the DSSA, NNA extended Coyle's contract deadlines multiple times thereby allowing Coyle to further enjoy the benefits of the DSSA. NNA's actions did not unfairly frustrate Coyle's right to receive the benefits of the DSSA. For these reasons and the reasons discussed in the previous section regarding the breach of contract claim, the Court **grants** NNA's Motion for Summary Judgment on the breach of good faith claim.

## C.     Violation of Indiana Code § 23-2-2.7-2(1)(iv)

Indiana Code § 23-2-2.7-2(1)(iv) provides,

> It is unlawful for any franchisor . . . to engage in . . . [c]oercing the franchisee to . . . enter into any agreement with the franchisor . . . or do any other act prejudicial to the franchisee, by threatening to cancel or fail to renew any agreement between the franchisee and the franchisor. Notice in good faith to any franchisee of the franchisee's violation of the terms or provisions of a franchise or agreement does not constitute a violation of this subdivision.

In its Amended Complaint, Coyle alleges that NNA violated Indiana Code § 23-2-2.7-2(1)(iv) when NNA threatened to terminate the DSSA if Coyle did not propose a site within NNA's preferred area even if it was not reasonable or economically feasible (Filing No. 46 at 12).

NNA argues it is entitled to summary judgment on this claim because the evidence shows it did not threaten cancellation or nonrenewal of the DSSA. NNA granted extensions, offered support services, and amended the DSSA to facilitate Coyle's continuing status as a Nissan dealer. In NNA's November 27, 2013 letter to Coyle, NNA noted that it would continue working with Coyle to find an acceptable solution to the facility dilemma, and it indicated that NNA was open to reconsidering Coyle's contractual deadlines. Likewise, NNA's December 15, 2014 letter noted that it was committed to continuing to work with Coyle to find a mutually acceptable permanent location, and it again offered another extension of Coyle's deadlines.

NNA further argues that the statute specifically allows a franchisor (NNA) to give notice to a franchisee (Coyle) that the franchisee has failed to meet its obligations under the contract, and such action does not constitute a violation of the statute. "Notice in good faith to any franchisee of the franchisee's violation of the terms or provisions of a franchise or agreement does not constitute a violation of this subdivision." Ind. Code § 23-2-2.7-2(1)(iv). Thus, Coyle's allegation that NNA threatened not to continue the DSSA if Coyle failed to identify a site that satisfied NNA's requirements does not violate the statute because that communication was nothing more than a good-faith notice regarding the terms and provisions of the DSSA. NNA asserts its 2016 notice of default letter merely sought Coyle's compliance with specific contract terms to which Coyle agreed, and Coyle identified no ulterior purpose or objective distinct from contractual compliance.

NNA contends, even if it had actually threatened to enforce its termination rights under the DSSA, that would not violate the statute. The statute prohibits using the threat of termination to

obtain a benefit to which the franchisor is not entitled. It is not coercion simply for a franchisor to enforce its contractual rights. NNA notes that Coyle alleges NNA threatened to do what the DSSA allowed it to do—terminate the contract if Coyle did not fulfill its contractual obligations. NNA also argues that Coyle failed to identify any way in which NNA used the threat of termination to prejudice Coyle, which is a requirement of the statute; Coyle claims that the damages it suffered came from NNA's refusal to allow it to move to its preferred site, but that alleged damage or prejudice has nothing to do with threats of termination.

In response, Coyle asserts that its Amended Complaint clearly alleges NNA's wrongful threats to terminate the DSSA, and the Court agreed in its Order on the motion to dismiss that such was clearly pled. Additionally, Coyle argues, NNA's November 18, 2016 notice of default letter contained numerous threats of termination. The letter explained that if Coyle did not find a site NNA found approvable, NNA may seek the termination of the DSSA. The letter also cited the DSSA and warned Coyle that the DSSA specifically authorized termination of a dealer that did not meet its responsibilities. Additional evidence shows threats of termination if Coyle did not locate a site for the dealership.

Coyle argues that NNA based its threats of termination on an unreasonable demand that Coyle secure a site where none was available in an area NNA falsely claimed as its preferred area. Coyle contends that NNA is wrong in arguing that, if it did threaten termination, such was made in good faith and not in violation of Indiana Code § 23-2-2.7-2(1)(iv). However, Coyle argues, whether NNA's threats were made in good faith is a disputed material issue of fact that cannot be decided on summary judgment; a reasonable person could find that NNA's denial of Coyle's proposed sites from 2012 until 2017, which were within NNA's preferred areas, was unreasonable especially where NNA finally approved the same site in 2017. The DSSA did not give NNA a

contractual right to unreasonably reject site proposals and then threaten termination. Coyle further argues that NNA's refusal to approve a site prejudiced Coyle in the form of lost sales, lost incentives, and higher construction costs.

The Court first notes that, as to Coyle's argument that the Amended Complaint sufficiently pled NNA's wrongful threats to terminate the DSSA, those allegations were sufficient to survive a motion to dismiss, but at the summary judgment stage, Coyle must come forward with some evidence beyond just its allegations to support its claim.

Considering the evidence before the Court, it is clear that NNA raised the possibility of terminating the DSSA multiple times with Coyle. However, each time NNA raised the possibility of termination, it was within the context of Coyle's contractual obligation to locate and secure an acceptable site for the dealership. The DSSA specifically discussed NNA's reliance on Coyle timely fulfilling the site identification and acquisition requirements, and Coyle's failure to timely meet those requirements was to be considered a material breach for which NNA could terminate the contract. NNA was entitled under the DSSA to terminate the contract if Coyle did not meet its obligations, and NNA's "threats" simply were communications demanding compliance with the contractual obligations of the parties.

As discussed in the previous sections, the evidence does not support a finding of bad faith on the part of NNA. Coyle was not entitled to approval of any one particular site, and NNA had the discretionary authority to refuse approval of specific sites even within its preferred area on the basis of reasonable criteria such as accessibility and visibility. The evidence shows NNA consistently disapproved of the Broadway Site because of poor accessibility and visibility and then decided after years of futile searching that it would concede and approve the location. NNA extended Coyle's contract deadlines while at the same time reminding Coyle of its contractual

obligations and NNA's contractual remedies. The facts and evidence do not support a claim for violation of Indiana Code § 23-2-2.7-2(1)(iv). Therefore, the Court **grants** NNA's Motion for Summary Judgment on this claim as well as on the claim for declaratory judgment regarding Indiana Code § 23-2-2.7-2(1)(iv) (Count XII).

**D.**   **Violation of 15 U.S.C. § 1221**

Coyle's next claim is similar to its state law claim for threatening termination. The Automobile Dealers Day in Court Act ("ADDCA") provides a cause of action to an automobile dealer against an automobile manufacturer for damages sustained "by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

> The ADDCA provides a statutory definition for "good faith":
>
> The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

In its Amended Complaint, Coyle alleges that NNA violated the ADDCA through its coercion, intimidation, and threats of not providing a permanent DSSA and threatening termination of the temporary DSSA if Coyle did not propose a site within NNA's preferred area even if it was not reasonable or economically feasible (Filing No. 46 at 16).

NNA argues that the ADDCA's definition of good faith is narrow, and in order for a party to be liable, its coercion or intimidation must include a wrongful demand accompanied with a threat of sanction for noncompliance.  To give rise to potential liability, the threat must be unfairly

coercive, and where termination is involved, there must be a causal connection between the dealer's resistance to the coercive conduct and the termination for there to be a lack of good faith under the ADDCA.

NNA argues there was no termination or threat of termination, and there was no coercion as Coyle has not relocated to its preferred site, and it was not coerced into moving to a different site. NNA asserts it simply exercised its explicit contractual authority to approve or disapprove of Coyle's proposed site location and facilities, and it sought Coyle's compliance with its contractual obligations. NNA notes that, under the ADDCA, a manufacturer is not prohibited from enforcing just and reasonable contract provisions even if they appear burdensome to dealers. NNA argues that Coyle's ADDCA claim inadequately rests on the theory that NNA might have enforced the provisions of the DSSA requiring Coyle to provide dealership facilities on a site approved by NNA.

Coyle responds with arguments similar to its arguments advanced for its other claims.  It argues NNA violated the ADDCA when it repeatedly issued warnings that it would terminate Coyle's franchise if a site was not located within NNA's preferred location.  NNA did not disclose to Coyle that its proposed sites were within NNA's preferred location, NNA did not share its market study data with Coyle, and NNA wrongfully represented that Coyle's proposed sites were not approvable. Coyle argues that NNA threatened to terminate the DSSA to coerce Coyle into finding a more expensive, more desirable site. Coyle further argues that it does not have to demonstrate NNA was able to derive the benefit it sought from its coercive demands.

For the same reasons discussed in the sections above concerning the other claims, and based upon the parties' contractual rights and obligations, the Court concludes that NNA is entitled to summary judgment on the ADDCA claim. The evidence indicates that NNA did not fail to act

in good faith in performing or complying with the terms of the DSSA when it exercised its contractual authority to disapprove and approve of sites and demanded that Coyle fulfill its contractual obligations.  And the DSSA was never terminated, canceled, or not renewed.  Thus, the Motion for Summary Judgment is **granted** on the ADDCA claim.

E.     **Violation of the Robinson-Patman Act and Indiana Code § 23-2-2.7-2(5)**

The Robinson-Patman Act ("RPA") makes it "unlawful for any person engaged in commerce . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality." 15 U.S.C. § 13(a). To support an RPA claim, a plaintiff must present evidence of "(1) relevant sales made in interstate commerce; (2) sales were of products of 'like grade and quality'; (3) seller discriminated in price between plaintiff and another purchaser; and (4) discrimination may have injured or prevented competition to the favored purchaser's advantage." *Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*, 214 F. Supp. 3d 675, 687 (N.D. Ill. 2016) (citing *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006)).  Similarly, Indiana Code § 23-2-2.7-2(5) makes it unlawful for a franchisor to "[d]iscriminat[e] unfairly among its franchisees."

NNA points out that the Court allowed these claims to proceed beyond the motion to dismiss stage because the legal standard required accepting the allegations as true, but the Court had noted that Coyle would be required to support the claims with evidence in order for the claims to proceed further.  NNA argues that Coyle "can no longer rest on its speculative allegations based on a newspaper article describing the unproven allegations in a lawsuit brought by another dealer in a different state . . . or Coyle's disappointment at its sales performance in recent years relative to that of a local competitor." (Filing No. 108 at 19.) NNA asserts, now that the parties are at the summary judgment stage, Coyle must put forward evidence of price discrimination and

discrimination among franchisees, but it cannot do so because there is no evidence of such discrimination. There also is no evidence of harm to intrabrand competition or of a resulting injury to Coyle. NNA asserts it does not have a discriminatory incentive program or preferred dealers in the Louisville market area as Coyle alleged in its Amended Complaint, and NNA supports this contention with a sworn statement submitted in the designated evidence (*see* Filing No. 110 at 2).

Coyle responds that it has alleged sufficient facts to support these claims, and several of its allegations are not only plausible but also are "based on NNA's own admissions to a national publication and provide a reasonable inference to support the RPA secondary-line claim." (Filing No. 127 at 25.) Coyle argues, "[i]n additional [sic] to what Coyle Nissan has already alleged and submitted in furtherance of its claim, NNA has objected to Coyle Nissan's written discovery responses that request NNA's intervention agreement with Jeff Wyler, the dealer Coyle Nissan has identified in NNA's violation of the RPA." *Id.* Coyle then argues that summary judgment is premature, and NNA resisted discovery requests regarding potential evidence that could support the RPA claim.

Coyle contends that NNA has an intervention agreement with an Ohio store that constitutes an RPA violation; because of sharing inventory and common ownership, Jeff Wyler Louisville was able to offer below-wholesale pricing even though it was a sister-store that had the agreement; the fact of the violation is enough to show that the discrimination may harm competition; and even though Coyle cannot quantify damages precisely, damages can be awarded on the basis of a plaintiff's estimate of sales it could have made absent the violation.

In reply, NNA argues Coyle has presented no evidence for these claims. Additionally, NNA explains it objected to a discovery request for any intervention agreement with Jeff Wyler Nissan because the request sought documents irrelevant to any claim or defense, yet NNA also

promptly produced the only two documents responsive to the request. NNA produced the documents ten days before the deadline for Coyle's summary judgment opposition, yet Coyle did not offer the documents into evidence. NNA argues that Coyle must have determined that the documents did not support Coyle's claims and were irrelevant, as NNA's objections stated.

NNA's argument that the evidence designated by the parties supports summary judgment on these claims, is persuasive. The only evidence that Coyle designated and cited to the Court concerning any "incentives" is that "Compton and other NNA representatives made verbal promises to Coyle about a variety of incentives, including purchase incentives, that would become available to Coyle once building an NREDI compliant facility," (Filing No. 127 at 11), citing to the parties' DSSA at Filing No. 46-1 at 6. However, that portion of the DSSA does not discuss a "variety of incentives, including purchase incentives, that would become available to Coyle once building an NREDI compliant facility." And in any event, Coyle's assertion explicitly claims that the incentives would be available to Coyle, not to "preferred dealers" only and through a "discriminatory incentive program."

Furthermore, Coyle did not cite in its summary judgment brief to any designated evidence to support its allegations that NNA made admissions to a national publication, that NNA has an intervention agreement with an Ohio store, and that Jeff Wyler Louisville was able to offer below-wholesale pricing even though it was a sister-store that had the agreement. The "court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie*, 242 F.3d at 723. Coyle cannot defeat summary judgment with "conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink*, 900 F. Supp. at 1072. Evidence has not been designated to support each of the elements of the RPA claim and the claim under Indiana Code § 23-2-2.7-2(5). Therefore, the Court **grants** NNA's Motion for

Summary Judgment on these claims as well as on the claim for declaratory judgment regarding Indiana Code § 23-2-2.7-2(5) (Count XII).

## IV.      <u>CONCLUSION</u>

For the reasons discussed above, Defendant Nissan North America, Inc.'s Motion for Summary Judgment, (Filing No. 108), is **GRANTED**.  Summary judgment is entered in favor of NNA on Coyle's claims for breach of contract (Count I), breach of the covenant of good faith under California law (Count III), violation of Indiana Code § 23-2-2.7-2(1)(iv) (Count V), violation of Indiana Code § 23-2-2.7-2(5) (Count VI), violation of 15 U.S.C. § 1221 (Count X), violation of the Robinson-Patman Act, 15 U.S.C. § 13(a) (Count XI), and declaratory judgment (Count XII). This Order does not address or resolve the supplemental pleadings and the counterclaims filed by the parties at Filing No. 167-1 and Filing No. 198 after the summary judgment briefing had been completed.  No final judgment will enter at this time as the counterclaims remain pending.

**SO ORDERED.**

Date:  9/21/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brad S. Keeton
STOLL KEENON OGDEN PLLC
brad.keeton@skofirm.com

Christopher DeVito
MORGANSTERN, MACADAMS &
DEVITO CO., L.P.A.
ChrisMDeVito@gmail.com

Joel T. Nagle
STOLL KEENON OGDEN, PLLC
joel.nagle@skofirm.com

Evan Livermore
DORSEY & WHITNEY
livermore.evan@dorsey.com

Ronald C. Smith
STOLL KEENON OGDEN, PLLC
Ron.Smith@skofirm.com

Anna K.B. Finstrom
DORSEY & WHITNEY LLP
finstrom.anna@dorsey.com

William C. Wagner
TAFT STETTINIUS & HOLLISTER LLP
wwagner@taftlaw.com

Steven J. Wells
DORSEY & WHITNEY LLP
wells.steve@dorsey.com